IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | |
|---|---|
| JANE IJEAKU EZEKWESILI ) 14128 Howard Rd. ) Dayton, MD 21036 ) ) Plaintiff ) v. ) ) LAWONNE PROCTOR ) 9715 Stone Cross Bend Dr. ) Houston, TX 77070 ) ) AND ) ) BRUCE PROCTOR ) 9715 Stone Cross Bend Dr. ) Houston, TX 77070 ) ) Defendants ) ) | Civil Action No. 1:24-cv-02132-SLS |


AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Breach of Contract, Breach of Fiduciary Duty, Fraudulent Inducement, Conversion, Civil Conspiracy

Comes now the Plaintiff, Jane Ijeaku Ezekwesili, ("Plaintiff") by and through her counsel, and states as follows:

1.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332. The Plaintiff is a citizen of the State of Maryland, the Defendants are citizens of the State of Texas and the amount in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000.00) exclusive of interest and costs.  Based upon these grounds, Defendants filed with

this Honorable Court on July 23, 2024, their Amended Notice of Removal, establishing this Court's jurisdiction as to this case.

2.    Plaintiff is an adult citizen of the United States of America and domiciled in the State of Maryland.

3.    Upon information and belief, Defendant, LaWonne Proctor, ("Defendant, Ms. Proctor") is an adult citizen of the United States of America, domiciled in the State of Texas, and was doing business in the District of Columbia.("DC") as the Chief Executive Officer of the business entity known as Family Solutions of Ohio ("Family Solutions DC") which is licensed by DC as a mental health rehabilitation services (MHRS) provider and a Substance Use Disorder (SUD) provider.

4.    Upon information and belief, Defendant, Bruce Proctor, ("Defendant, Mr. Proctor") is an adult citizen of the United States of America, the spouse of Defendant, Ms. Proctor, and is domiciled in the State of Texas.

5.    The claims asserted by Plaintiff herein relate to Defendant, Ms. Proctor's statements to and actions with Plaintiff for the two of them to organize a new business that would provide MHRS services in DC called "New Life Corporation. ("New Life")   These claims are breach of contract committed by Defendant, Ms. Proctor as to the formation of New Life, the torts of breach of fiduciary duty, fraudulent inducement, and conversion committed by Defendant, Ms. Proctor and Mr. Proctor, and a tortious conspiracy between Defendant, Ms. Proctor and Defendant, Mr. Proctor to commit the aforesaid wrongful acts.

6.    Plaintiff has experience and knowledge operating MHRS companies in Maryland that are paid Medicaid funds distributed by the State of Maryland.  Plaintiff is an owner of TruLife Mental Health Services LLC, ("TruLife MD") a Maryland limited liability company that

provides MHRS services in Maryland. Prior to the events described herein, Plaintiff had no experience with MHRS companies in D.C.

7. Upon information and belief, Defendant, Ms. Proctor has experience and knowledge operating MHRS companies in D.C. that are paid Medicaid funds distributed by the government of DC. As alleged herein in paragraph 3 above, Defendant, Ms. Proctor was the Chief Executive Officer of the business entity known as Family Solutions of Ohio, Inc. ("Family Solutions DC")

8. During the time period of December, 2021, to November, 2022, Defendant, Ms. Proctor was employed by a company she owned, "Kids First." Kids First worked as an independent contractor for TruLifeMD. Defendant, Ms. Proctor worked as an independent contractor for Plaintiff's company as a "Rehabilitation Counselor."

9. During the time Defendant, Ms. Proctor, performed work for Plaintiff's company, Plaintiff and Defendant, Ms. Proctor became friends and Plaintiff developed trust in Defendant, Ms. Proctor.

10. Defendant, Ms. Proctor represented and warranted to Plaintiff that the DC government had a "moratorium" suspending the licensing of new MHRS providers.

11. In the year 2022, Defendant, Ms. Proctor approached the Plaintiff and proposed that they enter into a partnership to own and operate a company that provided "substance use disorder" ("SUD") services in DC for which it would receive Medicaid payments from the DC government. In response to Defendant, Ms. Proctor's proposal, Plaintiff declined.

12. Thereafter, Defendant, Ms. Proctor again asked Plaintiff to enter into a SUD business venture with her. Defendant, Ms. Proctor told Plaintiff that she knew Rhonda

Baskerville ("Baskerville) who had years of experience in Medicaid health service businesses in DC and that Baskerville would be willing to run the operations of the new venture.

13.     To finance the development and licensure of the new company, Defendant, Ms. Proctor suggested to Plaintiff that Plaintiff invest Seventy-Five Thousand Dollars ($75,000.00) to be paid to Baskerville to develop the corporate documents and license application for the new company.

14.     Plaintiff agreed to join Baskerville and Defendant, Ms. Proctor in the venture. Plaintiff  invested $75,000 that she paid to Baskerville for the development of the new company.

15.     On or about June 30, 2022, Plaintiff, the Defendant, Ms. Proctor, and Baskerville entered into a "Letter of Agreement" for the formation of a business enterprise named, "TrueLife Mental Health, D.C," ("TrueLife DC") that would provide substance use disorder health services.   A copy of the Letter of Agreement ("Agreement") is submitted herewith as Exhibit A.

16.     Baskerville, Plaintiff, and Defendant, Ms. Proctor, agreed that additional documents pertaining to the ownership of TrueLife DC will be prepared that establish the ownership of TrueLife DC. Plaintiff would own 45% of the ownership interests in TrueLife DC. Defendant, Ms. Proctor would own 45% of the ownership interests in TrueLife, DC.  Baskerville would own the remaining 10% of the ownership interests.

17.     A business entity with the name "TrueLife Mental Health D.C. Corporation" was organized by Defendant, Ms. Proctor and registered under the laws of the District of Columbia.

18.     Defendant, Ms. Proctor represented and warranted to Plaintiff that Baskerville developed by-laws and license application documents for TrueLife DC.  Defendant, Ms. Proctor also told Plaintiff that Plaintiff would need to invest additional funds in TrueLife DC because she

(Defendant, Ms. Proctor) did not have sufficient funds of her own to satisfy the financial resources requirement to obtain from DC a license for TruLife to perform SUD services.

19.     In a telephone call during January, 2023, Defendant, Ms. Proctor told Plaintiff that she had become the managing officer of a MHRS company called Affordable Health Care ("Affordable"), and that because of issues with the prior management of Affordable, it was under investigation by DC and was going to be dissolved.

20.     Defendant, Ms. Proctor, represented and stated to Plaintiff that she had access to information about the dissolution of Affordable from her work  with Affordable and that she was able to obtain information from DC about Affordable because she had positive relationships with persons in DC Department of Health.

21.     On January 12, 2023, Defendant, Ms. Proctor sent to Plaintiff an email forwarding a second email.  Defendant, Ms. Proctor represents to Plaintiff in the email that the second email she was forwarding was from a lawyer working on behalf of Affordable to resolve that company's issues with DC.   In support of this representation, there was attached to the email by Defendant, Ms. Proctor a "settlement agreement" that Defendant, Ms. Proctor represented to Plaintiff was being circulated between Affordable and DC to achieve the settlement.  A copy of Defendant, Ms. Proctor's email to Plaintiff, the second email,  and the Agreement attached to it are submitted herewith as Exhibit B.

22.     The representation by Defendant, Ms. Proctor to Plaintiff that Exhibit B was a settlement agreement settling a dispute between Affordable and DC was false.  Defendant, Ms. Proctor knew that this representation was false when she made the representation to Plaintiff.

23.     Defendant, Ms. Proctor represented and stated to Plaintiff that because Affordable would be dissolved, Affordable clients would obtain services from other MHRS providers in DC.

24.    Defendant, Ms. Proctor represented and stated to Plaintiff that because of her work as manager of Affordable, Defendant, Ms. Proctor would be able to obtain a license from DC Department of Behavioral Health to operate as a MHRS provider.

25.    Defendant, Ms. Proctor suggested to Plaintiff that because a new MHRS provider provides more services and generates more revenue than a SUD provider, that the organization documents Plaintiff paid Baskerville $75,000.00 to organize TrueLife DC as a SUD services provider be redirected to develop TruLife DC as a new MHRS provider that would be able to provide MHRS services to Affordable clients that would need a new provider.

26.    Based upon Defendant, Ms. Proctor's representations as alleged herein which Plaintiff relied upon based upon Plaintiff's trust of Defendant, Ms. Proctor, Plaintiff agreed with this modification of the business plan for TrueLife DC to become a MHRS provider.

27.    Defendant, Ms. Proctor represented and stated to Plaintiff that Baskerville was writing the application documents for TrueLife DC as a new MHRS provider.

28.    Upon information and belief, the aforesaid representations made by Defendant, Ms. Proctor to Plaintiff were false.    Plaintiff has not been presented by Ms. Proctor or anyone else with application documents for TrueLife DC  to become a MHRS provider in DC.

29.     Later in January, 2023, Defendant, Ms. Proctor informed Plaintiff an MHRS provider named Family Solutions of Ohio, Inc. ("Family Solutions DC")  was for sale. Defendant, Ms. Proctor asked Plaintiff to invest money with Defendant, Ms. Proctor to purchase Family Solutions DC as an MHRS provider they would co-own.

30.    Family Solutions DC was owned by an individual named John Hopkins. ("Hopkins") Hopkins is not related to or involved in the health care entities in the United States with "Hopkins" in their names. Hopkins is an individual who owns and operates MHRS service

providers in multiple states of the United States that are named, "Family Solutions of Ohio." The main office of these multiple entities is in Wake Forest, North Carolina.

31.     Plaintiff declined Defendant, Ms. Proctor's suggestion that they purchase Family Solutions DC because of the process that was underway to develop and license TrueLife DC as an MHRS provider.

32.     In a telephone call on or about February 1, 2023, Defendant, Ms. Proctor told Plaintiff that Affordable would soon be dissolved and closed.

33.     At the request of Defendant, Ms. Proctor, during the evening of February 2, 2023, Plaintiff,  Defendant, Ms. Proctor, and Defendant, Mr. Proctor, met at a restaurant in Rockville, Maryland, for further discussions about the new company proposal. Defendant, Mr. Proctor had with him at the meeting the Proctors' young son and participated in the discussions about the new MHRS company.  During the meeting. Defendant, Ms. Proctor showed Plaintiff a digital picture of a bank deposit in the approximate amount of $400,000.00 paid by DC Department of Behavioral Health.  Defendant, Ms. Proctor represented and stated to Plaintiff that this deposit for $400,000.00  was a weekly payment that was received by Affordable for MHRS services provided to three hundred (300) Affordable clients that would be moving to Family Solutions DC.

34.     Defendant, Mr. Proctor, represented to Plaintiff that Affordable was a big business, and said to Plaintiff that she could make a lot of money.

35.     At this restaurant meeting, Defendant, Ms. Proctor represented to Plaintiff that after its dissolution, Affordable's  MHRS clients would move to new MHRS providers.

Defendant, Ms. Proctor said that the three hundred (300) former Affordable clients would then receive their MHRS services from Family Solutions.

36. On February 4, 2023, Plaintiff, her husband, Mr. Alfred Ezekwesili ("Mr. Ezekwesili"), Defendant, Ms. Proctor. and Defendant, Mr. Proctor met at D.C. Capital Square Restaurant.

37. Defendant, Ms. Proctor represented and stated to Plaintiff that because of the work she was doing with DC about the issues involving Affordable, that she would be qualified by DC to open a new MHRS company co-owned by Plaintiff and Defendant, and that this new MHRS would provide services to the former clients of Affordable.

38. Defendant, Ms. Proctor represented and warranted to Plaintiff that if Plaintiff invested the money necessary to establish the MHRS provider and have it begin doing business, the investment would be repaid to Plaintiff in three (3) months from DC Medicaid revenue earned by Family Solutions for services provided to a specified group of two hundred (200) former Affordable clients that would move to Family Solutions. ("group of 200 clients") as part of the 300 former Affordable clients that would obtain their MHRS services from Family Solutions.

39. Defendant, Ms. Proctor represented and warranted to Plaintiff that after their jointly owned new company began providing MHRS services that the former Affordable clients would transition from Family Solutions to the new jointly owned company to receive their services.

40. Further, Defendant Proctor represented and warranted that after the DC Medicaid revenue earned from the group of 200 clients had repaid to Plaintiff the investment she had made, the Medicaid revenue each client in the group of 200 clients earned for the new company

would continue to be paid to Plaintiff as long as the client continued to generate revenue for the new company.

41.    Defendant, Mr. Proctor affirmed his wife's statements about the revenue that would be generated by Affordable's clients to pay Plaintiff's investment back and after the investment was repaid, the clients would continue to earn revenue for the new company that would be paid to Plaintiff.

42.    When Defendant, Ms. Proctor made these representations to Plaintiff, Plaintiff believed that the new company Defendant, Ms. Proctor was referring to was TrueLife DC which Baskerville was preparing compliance documents to begin doing business.

43.    In response to Defendant, Ms. Proctor's proposal for an investment to be made by Plaintiff to  complete the organization, licensing,  and opening of a MHRS provider that would be repaid to Plaintiff from a client base of former Affordable clients, Plaintiff told Defendant, Ms. Proctor that Plaintiff would need to review business records showing the DC Medicaid revenue that Affordable was receiving for services provided to former Affordable clients.

44.    On February 8, 2023, Defendant, Ms. Proctor sent Plaintiff a digital image of a Form 1099 that she said was revenue earned by Affordable.  A copy of that form is submitted herewith as Exhibit  C.

45.    On or about February 20, 2023, Plaintiff received a telephone call from Defendant, Ms. Proctor.  She stated to Plaintiff that she had been approved by DC to own a MHRS company as part of an agreement made by Affordable with DC to end an appeal Affordable had filed in court.

46.     At the end of February or the beginning of March, 2023, Defendant, Ms. Proctor told Plaintiff that she had purchased Family Solutions from Hopkins for One Million Dollars

($1,000,000.00)  Defendant, Ms. Proctor delivered to Plaintiff a copy of a  "Form DC -1513" purporting to be signed and dated by Hopkins on January 23, 2023, that Defendant, Ms. Proctor said confirmed  the acquisition by Ms. Proctor of Family Solutions.   A copy of this document is submitted herewith as Exhibit D.

47.      On March 6, 2023, a remote video conference via Zoom was conducted.  Plaintiff and Mr. Ezekwesili were at their residence in Howard County, MD. Plaintiff was told by Defendant, Ms. Proctor that she was at her residence in the State of Texas and that her husband was also present.

48.      During this Zoom session Defendant, Ms. Proctor affirmed the substance of her representations and statements described in paragraphs 21, 22, 23, 24, 27,33, 35, 38, 39, and 40.

49.      Defendant, Ms. Proctor said the amount that Plaintiff should plan to invest to establish the company and have it ready to do business would be $600,000.00

50.      Defendant, Ms. Proctor invited Plaintiff and her husband to be guests of the Proctors' at their home in Austin, Texas.  Because Plaintiff already had plans to go to Texas, Mr. Ezekwesili and Plaintiff made arrangements to fly into Austin, visit with the Proctors, and then drive to Houston for the second part of their visit and depart from there to return home.

51.      On March 22, 2023, Plaintiff and Mr. Ezekwesili traveled to Houston, Texas to be the guests of Defendant, Ms. Proctor and Defendant, Mr. Proctor at their home.

52.      During the first day of the Ezekwesili's' visit, Defendant, Ms. Proctor and Defendant, Mr. Proctor drove the Plaintiff and Mr. Ezekwesili around the city. The showed Plaintiff and Mr. Ezekwesili two attractive unoccupied houses that they said they had purchased, and took them to a third attractive home that they had purchased that was occupied by a young man that Defendant, Ms. Proctor said was their adopted son,  The Proctors also took Plaintiff and

her husband to a "clubhouse" in a residential community where Defendant, Ms. Proctor said she had purchased a house where her mother lived.  She then displayed to the Ezekwesili's pictures of an estate house in Houston. Texas where she and Defendant, Mr. Proctor would be living that she said she had paid $2,800,00.00, in cash to purchase.  Defendant, Ms. Proctor, invited Plaintiff and Mr. Ezekwesili to a housewarming event that she had scheduled for August, 12, 2023.

53.     During these discussions about the properties they had purchased, Defendant, Mr. Proctor and Defendant, Ms. Proctor represented to Plaintiff and Mr. Ezekwesili that they were able to purchase these attractive and expensive homes as a result of the success of Affordable and the Medicaid revenue it generated.

54.     From the beginning of the arrival of the Plaintiff and her husband on March 22, 2023, at the Proctor home, in the discussions they had with Defendant, Mr. Proctor, and Defendant, Ms. Proctor, Defendant, Ms. Proctor represented and stated to Plaintiff:

a.     that Affordable would close on April 30, 2023, and that it would be her last day working for Affordable.

b.     that Affordable clients  would then begin receiving MHRS services from Family Solutions until the New Company was ready to provide services;

c.     when the licensing and application procedures for the New Company were completed by Baskerville, the group of 200 Affordable clients that had been receiving services from Family Solutions will transition to and receive their MHRS services from the new company; and

d.     that the amount of the investment for Plaintiff to make and deliver to Defendant, Ms. Proctor that would be used by  Ms. Proctor to complete the process of

establishing the MHRS company and making it ready to perform MHRS services to the former Affordable clients would be Eight Hundred Seventy Five Thousand Dollars ($875,000.00).

55.    Plaintiff told Defendant, Ms. Proctor that she was unwilling to make an investment of  $875,00.00.

56.    Defendant, Ms. Proctor said it would be acceptable if Plaintiff invested Seven Hundred Thousand Dollars ($700,000.00) during the visit and an additional One Hundred Seventy Five Thousand Dollars ($175,000.00) after the new company began receiving revenue from  the group of 200 clients to begin repaying the initial investment by Plaintiff.

57.    Defendant, Ms. Proctor prepared an "Addendum" to the June 30, 2022, "Letter of Agreement," which stated the main elements of the agreement to develop the new MHRS company.

58.    In  reliance upon the friendship and trust between Plaintiff and Defendant, Ms. Proctor and the  representations of fact made by Defendants that are identified in paragraph 48, 53 and 54, Plaintiff decided to make the investment.

59.    In the "Addendum" to the June 30, 2022, Agreement,  Defendant, Ms. Proctor identified the "new company," as "New Life Corporation." ("New Life").   When Plaintiff inquired of Defendant, Ms. Proctor why there was a new name, and not TrueLife DC, Ms. Proctor responded that because TrueLife DC's licensing application was prepared as a SUD provider, a new company would be organized to be a MHRS provider.

60.    On March 24, 2023, Plaintiff and Defendant, Ms. Proctor, executed the Addendum.  A copy of the Addendum is submitted herewith as Exhibit E.

61.    Consistent with their discussions and the provisions of the Addendum, it was understood and agreed by  Plaintiff and Defendant, Ms. Proctor, that the sole purpose for which

Plaintiff would deliver Seven Hundred Thousand Dollars ($700,000.00) to Defendant, Ms. Proctor, was to provide to Defendant, Ms. Proctor, funds to be used to complete the organization, licensing, and opening of New Life to provide MHRS services to clients that would include the group of 200 clients from Affordable that would go to Family Solutions and earn revenue that Family Solutions would pay to Plaintiff to repay the investment to Plaintiff, and then following the licensure of New Life, the group of 200 clients would transition to New Life, and the revenue from the 200 clients would continue to be paid to Plaintiff to first repay her investment, and then to provide her with recurring revenue from the 200 clients.

62. On March 24, 2023, Plaintiff executed a wire transfer from her bank in the State of Maryland that transferred to Defendant, Ms. Proctor's bank account at Truist the amount of Three Hundred Fifty Thousand Dollars ($350,000.00). A second wire transfer was executed by Plaintiff on March 27, 2023, of Three Hundred Fifty Thousand Dollars ($350,000.00) from her bank in the State of Maryland to Defendant, Ms. Proctor's bank account at Truist.

63. In April, 2023, Ms. Proctor organized a "community outreach" event with a booth at which Ms. Proctor, Mr. Proctor, Plaintiff, Mr. Ezekwesili, and staff of Family Solutions met with people in the community to inform and promote to DC residents the opening of New Life as a new mental health care provider in the community.

64. Also, in April, 2023, Defendant, Ms. Proctor took Plaintiff to a commercial office space in the basement of the building where Family Solutions was located. Defendant , Ms. Proctor said a "fire inspection" was scheduled to be conducted and that the basement office space would ultimately become the location where New Life would do business.

65.    April 30, 2023, was the last day Defendant, Ms. Proctor worked for Affordable. Upon information and belief, that date was the last day Affordable was open and providing services.

66.    In May, 2023, Plaintiff received no money from Family Solutions, as had been expected by Plaintiff from the representations of Defendant, Ms. Proctor.  Plaintiff asked Defendant, Ms. Proctor, about the Affordable clients receiving MHRS services from Family Solutions that would result in revenue that Plaintiff would receive,  Defendant, Ms. Proctor responded to Plaintiff's inquiries with vague statements about difficulties Family Solutions was having in its management structure.  Ms. Proctor provided no information about Affordable clients receiving services from Family Solutions that was generating revenue.

67.    New Life did not exist in May 2023. The records of the District of Columbia, Department of Licensing and Consumer Production state that Defendant, Ms. Proctor filed documents to organize "New Life Corporation" on June 1, 2023.  The address of Defendant, Ms. Proctor is stated as  Suite 47681, 6514 Marlboro Pike, District Heights MD 20273.   See, Exhibit F, submitted herewith.  Upon information and belief the address stated for Ms. Proctor of  6514 Marlboro Pike, District Heights MD 20273, is the location of a U.S. Post Office.

68.    Defendant, Ms. Proctor, has not ever presented to Plaintiff any documents that were prepared and submitted by Defendant, Ms. Proctor to the DC government for the licensure of New Life. Notwithstanding that the Defendant, Ms. Proctor, covenanted and agreed that the money she received from Plaintiff would be used for the purpose of completing the organization, licensing, and opening for business of New Life, Plaintiff's money was not used by Defendant Ms. Proctor for that purpose.

69.    In June, 2023, Defendant, Ms. Proctor asked Plaintiff to become the chief executive officer at Family Solutions to help with the management problems at that company. Plaintiff was told by Defendant, Ms. Proctor, that she would be paid $1,000.00 every two weeks as compensation for her services to Family Solutions.

70.    Because Plaintiff wanted to know the status of the Affordable clients that had been designated to transition from Affordable to Family Solutions, Plaintiff accepted the position of CEO offered by Defendant, Ms. Proctor.

71.    It did not take long after Plaintiff began her work at Family Solutions for Plaintiff to know that there were no clients from Affordable receiving services from Family Solutions that would then move to receive services from New Life.

72.    On August 11, 2023, Plaintiff received an email that included a letter to her addressed to her as CEO Family Solutions that was from the DC Department of Behavioral Health stating that the certification of Family Solutions was revoked.  Following this, Plaintiff was interviewed by an agent of the Inspector General, Medicaid Fraud Control Unit, of the District of Columbia.

73.    After the letter revoking the certification of Family Solution, Defendant, Ms. Proctor continued to insist to Plaintiff that there existed 200 clients that were generating revenue for Family Solutions since May 1, 2023.

74.    On August 17, 2023, the Plaintiff sent an email to the DC Department of Behavioral Health giving notice of  her resignation as CEO of Family Solutions.

75.    Plaintiff received wage compensation from Family Solutions on July 6, 2023, August 4, 2023, and August 18, 2023.  Family Solutions and Defendant, Ms. Proctor did not pay Plaintiff compensation for the week of July 20, 2023.

76.     The records of DC Department of Behavioral Health continued as of the date of filing of the original Complaint to identify Plaintiff as a corporate representative of Family Solutions.

77.     During a discussion Plaintiff had with Ms. Proctor, about the money she received from Plaintiff, Ms. Proctor stated to Plaintiff that the Seven Hundred Thousand Dollars ($700,000.00) she received from Plaintiff she paid to Hopkins for Ms. Proctor's purchase of Family Solutions.

78.     On December 29, 2023, Plaintiff's counsel sent to Defendant, Ms. Proctor a letter demanding the return of the Seven Hundred Thousand Dollars ($700,000.00) that Plaintiff delivered to Defendant, Ms. Proctor to fund the organization and opening costs of operating New Life.   A copy of this demand letter is attached hereto as Exhibit G.  Defendant, Ms. Proctor, has not responded to this letter other than to acknowledge to Plaintiff that she received it.

79.     Upon information and belief, Plaintiff avers that:  documentation for the granting of a license for New Life to provide MHRS services was not submitted to DC by Defendant Proctor or Baskerville;  that New Life has not provided MHRS services to clients or performed any other work that produced revenue;  that Defendant, Ms. Proctor, in her position as CEO of Family Solutions, has not had Family Solutions distribute money to Plaintiff to pay back to Plaintiff her investment of Seven Hundred Thousand Dollars ($700,000.00) Plaintiff entrusted to Defendant, Ms. Proctor; and Defendant, Ms. Proctor, has not returned to Plaintiff the Seven Hundred Thousand Dollars ($700,000.00) Plaintiff entrusted to Defendant, Ms. Proctor.

80.     Defendant, Mr. Proctor, and Defendant, Ms. Proctor, (collectively, "Defendants") agreed and conspired to wrongfully engage in deceitful acts that would fraudulently induce Plaintiff to accept as true facts known by both Defendants to be false when made to Plaintiff for

the purpose of inducing Plaintiff to entrust with Ms. Proctor the monies herein described and to permit the wrongful misuse by Defendants of Plaintiff's money for the wrongful purpose of benefiting both Defendants.

81.    In furtherance of the conspiracy, Defendant, Mr. Proctor, performed the following acts:  attended the meetings with Defendant, Ms. Proctor, and Plaintiff on February 2, 2023, February 4, 2023, in Austin, Texas from March 22, 2023 to March 24, 2023 and the "community outreach" in April, 2023; during these meetings, Defendant, Mr. Proctor made statements to Plaintiff and Mr. Ezekwesili promoting the business success of Defendant Ms. Proctor, and the revenue generated by Affordable and the Affordable clients that would repay to Plaintiff her investment and provide substantial additional revenue for Plaintiff's benefit.

82.    Upon information and belief, Defendants have induced one or more other persons to put money into the organization of a mental health service company that failed to do such business, resulting in the loss of that money.

## COUNT I
### (Breach of Contract)

83.    Plaintiff incorporates herein by reference paragraphs 1 – 82, above.

84.    In accordance with the provisions of the Contract as modified by the Addendum, Defendant, Ms. Proctor,  covenanted and agreed with Plaintiff that the funds  in the amount of Seven Hundred Thousand Dollars ($700,000.00) which Plaintiff entrusted to and  delivered into the possession of Defendant, Ms. Proctor on March 24, 2024, would be used by Defendant, Ms. Proctor for the sole purpose to  organize, license, and open for business New Life Corporation, as a new MHRS Company in DC;.

84.     Defendant, Ms. Proctor breached the terms of the Contract and failed to use Plaintiff's Seven Hundred Thousand Dollars ($700,000.00) that had been delivered to Defendant, Ms. Proctor for the purpose of organizing, licensing, and opening for business New Life as a new MHRS provider in DC.

85     Defendant's failure to use Plaintiff's money to organize, license, and make operational New Life as a provider of MHRS services in DC is a material breach of the Contract between Plaintiff and Defendant, Proctor.

86.     Plaintiff, on multiple occasions personally, and then by and through her counsel, made demand upon Defendant, Ms. Proctor for return of the Seven Hundred Thousand Dollars ($700,000.00).

87.     Defendant, Ms. Proctor failed and refused to respond to the demands from Plaintiff to return the money and has failed and refused to return to Plaintiff the funds wrongfully retained by this Defendant.

88.     As a direct and proximate result of Defendant, Ms. Proctor's breach of contract, Plaintiff has suffered compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00), plus pre-judgment interest on said funds.

**COUNT II**
**(Breach of Fiduciary Duty)**

89.     Plaintiff incorporates herein by reference paragraphs 1 - 88 above.

90.     Defendant, Ms. Proctor represented to Plaintiff that if Plaintiff would deliver to her the amount of Seven Hundred Thousand Dollars ($700,000.00) as an investment in New Life it would be used by Defendant Ms. Proctor to organize, license, and open NewLife to do business in DC as an MHRS provider.

91. Based upon Plaintiff's prior relationship of friendship with and trust in Defendant, and the aforesaid representations and warranties made by her to Plaintiff, Plaintiff entrusted Defendant, Ms. Proctor to take possession and control of the money of Plaintiff in the amount of Seven Hundred Thousand Dollars ($700,000.00) that would be used by Defendant, Ms. Proctor for the sole purpose of organizing, obtaining a license for, and opening for business a new MHRS provider in DC named New Life Corporation.

92. In accordance with applicable law, Defendant, Ms. Proctor was the agent of Plaintiff to hold the aforesaid entrusted funds of Plaintiff in Defendant, Ms. Proctor's care, custody and control and that they would be used for the sole purpose of completing the organization, licensing, and opening for business of NewLife Corporation.

93. Defendant, Ms. Proctor was a fiduciary of Plaintiff, and in accordance with applicable law owed Plaintiff a fiduciary duty to use the funds entrusted by Plaintiff to her for the purposes herein described.

94. Defendant, Ms. Proctor did not use the entrusted funds for the purpose that Plaintiff entrusted the funds to Defendant, Ms. Proctor, i.e., the organization, licensing of, opening of New Life to perform MHRS services in the District of Columbia.

95. Upon information and belief, Defendant, Ms. Proctor used the entrusted funds to enrich herself and Mr. Proctor and for their own purposes.

96. Defendant, Ms. Proctor committed a material and substantial breach of her fiduciary duties to Plaintiff by failing to use the entrusted funds for the purposes Plaintiff entrusted those funds to said Defendant.

97. Defendant, Ms. Proctor's material breach of her fiduciary duty to Plaintiff was aggravated by Defendants' egregious conduct and state of mind.

98.     Defendants knowingly and intentionally relied upon the relationship of friendship and trust between Plaintiff and Defendant, Ms. Proctor to induce Plaintiff to entrust this large amount of money with Defendant Ms. Proctor without common, commercially reasonable safeguards, including but not limited to the use of joint signature bank accounts and checks for the disbursement of Plaintiff's entrusted funds that would provide Plaintiff with real time access by Plaintiff to monitor the account holding Plaintiff's funds.

99.     The statements made by Defendant, Ms. Proctor, to Plaintiff after Plaintiff's entrustment of the funds to Defendant were deliberate acts intended to delay Plaintiff's efforts to recover the funds entrusted to said Defendant and is aggravating egregious conduct and evidence of a malicious state of mind.

100.    While continuing to misrepresent and cover-up her own actions and the use being made of the entrusted funds, Defendant, Ms. Proctor used her relationship of friendship and trust to induce Plaintiff to do the following: to perform worthless marketing activities for a business that was never able to do business; and to provide employment services for the benefit of Defendant, Ms. Proctor, as Chief Executive Officer of Family Services which ultimately resulted in Plaintiff coming under the scrutiny of and being interviewed by the Medicaid Fraud Unit of the District of Columbia Office of the Inspector General.

101.    These deliberate acts of Defendant, Ms. Proctor were intended by Defendants to delay Plaintiff's efforts to recover the funds entrusted to said Defendant. They are aggravating egregious conduct and evidence of a malicious state of mind.

102.    As a direct and proximate result of Defendant, Ms. Proctor's breach of her fiduciary duties to the Plaintiff with the aid and participation of Mr. Proctor, Plaintiff has

suffered compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00).

103.    As a result of Defendant, Ms. Proctor's, tortious breach of the fiduciary duty owed by her to Plaintiff that was  aided and abetted by the actions of Mr. Proctor, and aggravated by egregious conduct and a state of mind on the part of the Defendants that justifies punitive damages, Plaintiff is entitled to receive an award of punitive damages from Defendants in the amount of Three Hundred and Fifty Thousand Dollars ($350,000.00).

104.    Under applicable law, Plaintiff is entitled to an award of her attorney fees and costs of this proceeding as an element of Plaintiff's compensatory damages.


## COUNT III
### (Fraud in the Inducement)

105.    Plaintiff incorporates herein by reference paragraphs 1 – 1043, above.

106.    The representations made by Defendant, Ms. Proctor to Plaintiff  aided by the knowing participation of Defendant, Mr. Proctor, as alleged in herein  were false and were known by Defendants to be false when the representations were made to Plaintiff.

107.    Contrary to the representations to Plaintiff by Defendant Ms. Proctor, Defendants did not intend to use the money received from Plaintiff for the purposes of completing the organization, licensing, and opening for business of NewLife Corporation.  There never were former Affordable clients that would receive services from and generate revenue for Family Solutions or New Life. Defendant, Ms. Proctor, did not perform acts to obtain a DC license for New Life to perform MHRS services.  Defendants used Plaintiff's funds for purposes other than the purpose(s) that were represented to Plaintiff that the funds would be used to accomplish.

108.    Defendants knew that Plaintiff would rely upon Ms. Proctor's misrepresentations of fact as alleged herein based upon Plaintiff's relationship of friendship and trust with Ms. Proctor and Ms. Proctor's experience of performing mental health rehabilitation services in DC compensated by Medicaid,  and Ms. Proctor's representation of having personal relationships with persons at the DC Department of health.

109.    In reliance upon the aforesaid facts and circumstances, Plaintiff was induced by Defendants to entrust with Ms. Proctor the sum of Seven Hundred Thousand Dollars ($700,000.00) without commercially reasonable safeguards to insure the proper use of the funds, including but not limited to the deposit of the funds into  jointly titled bank accounts requiring joint signature authority for the disbursement and access to the account holding the funds to permit the monitoring of  the use of the entrusted funds.

110.    Defendant, Ms. Proctor, with the knowing assistance of Mr. Proctor,  made the aforesaid misrepresentations of fact for the purpose of deceiving Plaintiff.

111.    Plaintiff's reliance upon the aforesaid misrepresentations of fact by Defendant, Ms. Proctor, was reasonable.

112.    As a direct and proximate result of the Defendant's deceitful, fraudulent, and tortious acts perpetrated upon Plaintiff, Plaintiff has suffered compensatory damages in the amount of Seven Hundred Thousand Dollars, ($700,000.00), plus pre-judgment interest.

113.    As a direct and proximate result of Defendants deceitful, fraudulent, and tortious acts, aggravated by egregious conduct and a state of mind that justifies punitive damages, Plaintiff is entitled to receive an award of punitive damages from Defendants in the amount of Three Hundred and Fifty Thousand Dollars ($350,000.00).

114.    Under applicable law, Plaintiff is entitled to an award of her attorney fees and costs of this proceeding as an element of Plaintiff's compensatory damages.

## COUNT IV
**(Conversion)**

115.    Plaintiff incorporates herein by reference paragraphs 1 – 114, above.

116.    When Defendants wrongfully used the funds Plaintiff entrusted to Ms. Proctor and delivered to her via Plaintiff's bank wire transfer by Plaintiff, Defendants engaged in an unlawful exercise of ownership, dominion and control over the personalty, of Plaintiff, i.e., a specific amount of funds entrusted to Defendant, Ms. Proctor and delivered to her in a specific account for the specific purposes described herein pertaining to New Life.

117    Defendants' acts as aforesaid are a denial of Plaintiff's rights in and to said personal property and an unlawful conversion by said Defendants of Plaintiff's personal property.

118.    As a direct and proximate result of Defendants' deceitful, fraudulent, and tortious acts perpetrated upon Plaintiff, Plaintiff has suffered compensatory damages in the amount of Seven Hundred Thousand Dollars, ($700,000.00), plus pre-judgment interest.

119.    As a direct and proximate result of Defendants' deceitful, fraudulent, and tortious acts, aggravated by egregious conduct and a state of mind that justifies punitive damages, Plaintiff is entitled to receive an award of punitive damages from Defendants in the amount of Three Hundred and Fifty Thousand Dollars ($350,000.00).

120.    Under applicable law, Plaintiff is entitled to an award of her attorney fees and costs of this proceeding as an element of Plaintiff's compensatory damages.

## COUNT V
**(Conspiracy)**

121.    Plaintiff incorporates herein by reference paragraphs 1 – 120, above.

122.    The wrongful acts as described herein of Defendant, Ms. Proctor, and Defendant, Mr. Proctor, in furtherance of the conspiracy between the Defendants is aggravating egregious conduct and evidence of a malicious state of mind on the part of the Defendants.

123.    As a direct and proximate result of the wrongful acts of the Defendants,  Plaintiff has suffered compensatory damages in the amount of Seven Hundred Thousand Dollars, ($700,000.00), plus pre-judgment interest.

124.    As a direct and proximate result of the Defendants' tortious conspiracy, aggravated by egregious conduct and a state of mind that justifies punitive damages, Plaintiff is entitled to receive an award of punitive damages against Defendants in the amount of Three Hundred and Fifty Thousand Dollars ($350,000.00).

125.    Under applicable law, Plaintiff is entitled to an award of her attorney fees and costs of this proceeding as an element of Plaintiff's compensatory damages claimed against Defendants.

WHEREFORE, the premises considered, it is respectfully requested that this Honorable Court enter judgments as follows:

1.    As to Count I, enter judgments in favor of the Plaintiff, Jane Ijeaku Ezekwesili, and against the Defendant, LaWonne Proctor, for:  compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00);  prejudgment interest;  and the court costs of these proceedings.

2.    As to Count II, enter judgments in favor of the Plaintiff, Jane Ijeaku Ezekwesili and against the Defendants, LaWonne Proctor and Bruce Proctor jointly and severally, for: compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00):

punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00):

prejudgment interest; an award of attorney's fees and litigation costs in prosecuting this action;

and the court costs of these proceedings.

3.      As to Count III, enter judgments in favor of the Plaintiff, Jane Ijeaku Ezekwesili

and against the Defendants, LaWonne Proctor and Bruce Proctor, jointly and severally, for:

compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00):

punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00):

prejudgment interest; an award of attorney's fees and litigation costs in prosecuting this action;

and the court costs of these proceedings.

4.      As to Count IV, enter judgments in favor of the Plaintiff, Jane Ijeaku Ezekwesili

and against the Defendants, LaWonne Proctor and Bruce Proctor, jointly and severally, for:

compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00):

punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00):

prejudgment interest; an award of attorney's fees and litigation costs in prosecuting this action;

and the court costs of these proceedings.

5.      As to Count V, enter judgments in favor of the Plaintiff, Jane Ijeaku Ezekwesili,

jointly and severally against Defendant LaWonne Proctor, and Defendant, Bruce Proctor, for:

compensatory damages in the amount of Seven Hundred Thousand Dollars ($700,000.00):

punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00):

prejudgment interest; an award of attorney's fees and litigation costs in prosecuting this action;

and the court costs of these proceedings.

6.      Awarding such other and further relief as to the Court seems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims asserted herein.

                            Respectfully submitted,

                            STEIN SPERLING BENNETT
                            DE JONG DRISCOLL PC

By:      /s/ E. Andrew Cole
                            E. Andrew Cole (D.C. Bar # 490858)
                            1101 Wootton Parkway, Suite 700
                            Rockville, Maryland 20852
                            Direct: 301-838-3218
                            Fax: 301-354-8118
                            ecole@steinsperling.com

     - And

                            NOBLE & CROW PA

By:      /s/ Alexander J. Crow
                            Alexander J. Crow (D.C. Bar #265397)
                            451 Hungerford Drive, Suite 750
                            Rockville, Maryland 20850
                            (301) 762-7201
                            acrow@noblecrow.com
                            Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2025, a copy of the foregoing Amended Complaint was sent via email to and submitted to the Court's electronic filing system for service upon the following person:

R.J. Vanzego, Jr., Esquire
Attorney for the Defendants
9450 Pennsylvania Ave., Ste. 5
Upper Marlboro, Maryland 20772
rjv@vanzegolaw.net
Attorneys for Defendants

                        /s/ Alexander J. Crow, Esq.
                        Alexander J. Crow